No. 80,738

STATE OF KANSAS, *Appellee*, v. TOD ALAN PABST, *Appellant.*
(996 P.2d 321)

Opinion filed February 11, 2000.

*Geary N. Gorup,* of the Law Office of Geary N. Gorup, argued the cause and was on the brief for appellant.

*Stephen D. Maxwell,* assistant attorney general, argued the cause, and *Jared S. Maag,* assistant attorney general, and *Carla J. Stovall,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

Six, J.: This is the rare case in which the prosecutor's improper remarks during closing argument were so prejudicial that a new trial is required. Defendant Tod Alan Pabst appeals his jury conviction for first-degree murder, K.S.A. 21-3401. The conviction arises out of the shooting death of Pabst's fiancée, Phoebe Harkins. The district court sentenced Pabst to 25 years to life in prison.

Our jurisdiction is under K.S.A. 22-3601(b)(1) (a life sentence was imposed).

The controlling question is whether Pabst was denied a fair trial by prosecutorial misconduct. We hold that he was. The State is free to retry Pabst because there was sufficient evidence of guilt presented in the first trial.

## FACTS

We set out a summary of the key facts. Additional facts are referenced in the discussion section of the opinion. Pabst shot Phoebe Harkins, his fiancée, twice in their home in March 1997. They had a 3-year-old daughter, who was also at home at the time of the shooting. The shooting took place after an argument about money. Pabst claimed the shooting was accidental.

Harkins was a bank vice-president; Pabst was a building contractor. Harkins and Pabst divided the responsibility for paying household bills. Harkins kept current on her obligations; Pabst did not. Discord in the relationship developed. Business was slow for Pabst. However, he had secured a contract on the day of the shooting to build a $200,000 home. Pabst testified that he was elated at the turn of events. When he returned home that evening, Harkins did not share in his excitement. She was upset. The gas company collected a past due bill from Harkins at the bank where she was employed. The gas bill was Pabst's responsibility. The argument leading to Harkins' death followed.

Pabst testified in his defense. According to Pabst, Harkins' reaction to his news of the $200,000 contract made him feel worthless. He retrieved a .44 caliber double-action revolver from his truck, brought it inside, and handed it to Harkins. He told her to shoot him if she thought he was so worthless. When Harkins said she might shoot herself or their daughter, he tried to take the weapon from her. They struggled over the gun from a standing position and began to fall on the couch, and the gun went off. Both of their hands were on the gun for at least the first shot. Pabst claims he tried to pick Harkins up off the couch and got blood on his hands in the process. He wiped the blood off his hands and then called 911.

A State witness testified that one bullet entered Harkins' arm a few inches below the shoulder. The bullet traveled through her arm and entered her chest below the armpit passing through a lung and shattering her spinal column. The second shot hit Harkins in the head just behind her right ear and exited just behind her left ear. Each shot was fatal. Police found Harkins in a sitting position

on the couch. Her legs were crossed and her torso was slumped to the side.

Forensic experts found no evidence of blood on Pabst's hands or clothes. Ballistic evidence showed that the gun was at least 1 to 5 feet away from Harkins when fired. There was no visible evidence of gunpowder residue on Harkins' hands. No fingerprints belonging to Harkins were found on the gun. The pattern of blood stains suggested that Harkins was sitting in an upright position on the couch when shot. An expert for the State testified that it would be physically impossible for Harkins' hands to be on the gun when fired due to the trajectory of the shots.

## DISCUSSION

We first examine the controlling question: Was Pabst denied a fair trial by prosecutorial misconduct? The answer is, "Yes."

Pabst argues the prosecutor made several improper and prejudicial remarks during trial. Pabst alleges misconduct took place during: (1) opening statement; (2) cross-examination of Pabst; and (3) closing argument. Reversible error predicated on prosecutorial misconduct must be of such a magnitude as to deny a defendant's constitutional right to a fair trial. See *State v. Sperry*, 267 Kan. 287, 308, 978 P.2d 933 (1999). Some complained-of prosecutorial statements were not objected to at trial. If the claimed error has been determined to implicate a defendant's right to a fair trial, our standard of review is the same whether or not an objection was made at trial. If the claimed error rises to the level of a denial of the Fourteenth Amendment right to due process, the issue will be addressed. *State v. McCorkendale*, 267 Kan. 263, Syl. ¶ 6, 979 P.2d 1239 (1999).

Although Pabst cites several examples of alleged misconduct, we discuss only the prosecutor's remarks contributing to our decision to reverse. Those remarks occurred during closing argument.

### Closing Argument

Pabst contends that the prosecutor made numerous improper remarks during closing argument. According to Pabst, the prosecutor: (1) attempted to inflame the passions or prejudices of the jury; (2) suggested that the defense withheld evidence from the

jury; (3) called Pabst a liar; and (4) shifted the burden of proof to Pabst. We focus only on the last two complaints.

The analysis of the effect of a prosecutor's alleged improper remarks in closing argument is a two-step process. First, we decide whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. In criminal trials, the prosecution is given wide latitude in language and in manner of presentation of closing argument as long as the argument is consistent with the evidence. Second, we must decide whether the remarks constitute plain error; that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny a fair trial, requiring reversal. *State v. Lumley,* 266 Kan. 939, Syl. ¶ 12, 976 P.2d 486 (1999).

A review of the transcript shows that the prosecutor accused Pabst of lying at least 11 times during closing argument:

"[PROSECUTOR]: . . . During the Defendant's testimony you heard 42 'I don't knows.' *You heard many lies* that I think you heard. *The Defendant [sat] right before you and lied to you about what happened.* . . .

. . . .

"While the defense attorney's talking to you, remember one thing; the State put the facts in front of you. *We didn't lie to you.* We didn't hide anything. We put all the facts in front of you for you to decide, because the State seeks justice here. They seek the proper result based on the evidence. And what did the Defendant do? *He lied to you. Many, many times, he lied to you.* So while Mr. Falk talks to you, remember that his client, *the Defendant, lied to you.* He didn't even give you close to a reasonable explanation. Ladies and gentlemen, listen to him with that in your mind.

. . . .

". . . He wants you to have it both ways. Believe the Defendant's testimony, ladies and gentlemen, in order to buy defense counsel's argument here, you have to believe this Defendant. And you saw him. You heard from him. *I look into each one of your eyes and I tell you he lied.*

"[DEFENSE COUNSEL]: Objection. Inappropriate comment by counsel. Cannot interject personal feelings.

"THE COURT: Sustained. Ladies and gentlemen, I would again direct you to disregard the last comment of counsel.

"[DEFENSE COUNSEL]: Your Honor, to preserve the record, we'd move for a mistrial at this time based on prosecutorial misconduct.

"THE COURT: And that would be denied. Please continue, Mr. Maxwell.

"[PROSECUTOR]: *The State tells you he lied.* The State of Kansas—

"[DEFENSE COUNSEL]: Objection, Your Honor. It's inappropriate for him to make—

"[PROSECUTOR]: That's fair comment, Your Honor.

"THE COURT: Overruled.

"[PROSECUTOR]: *The State tells you he lied,* ladies and gentlemen. *He lied to you. He got on that witness stand and he lied directly to you.* He got up, down here in front of you, and *he again lied directly to you.* He could not explain this. He had no explanation." (Emphasis added.)

Whether couched in terms of the State or the prosecutor, the assertion that Pabst lied was improper. See *State v. Lockhart,* 24 Kan. App. 2d 488, 492, 947 P.2d 461 (1997). It was also improper for the prosecutor to claim, "We didn't lie to you," in an attempt to bolster the credibility of the State's witnesses. See *State v. Mosley,* 25 Kan. App. 2d 519, 525, 965 P.2d 848, *rev. denied* 266 Kan. 113 (1998) (involving prosecutor's comment on the credibility of his own witnesses).

The Kansas Rules of Professional Conduct (KRPC) and the American Bar Association Standards of Criminal Justice instruct on prosecutorial comment. Our rules of conduct clearly and unequivocally say that it is improper for a lawyer to comment on a witness' credibility.

KRPC 3.4 (1999 Kan. Ct. R. Annot. 369-70) states:

"A lawyer shall not:

. . . .

"(e) in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or *state a personal opinion* as to the justness of a cause, *the credibility of a witness,* the culpability of a civil litigant or the guilt or innocence of an accused." (Emphasis added.)

The ABA standards for prosecutors say:

"(a) In closing argument to the jury, the prosecutor may argue all reasonable inferences from evidence in the record. The prosecutor should not intentionally misstate the evidence or mislead the jury as to the inferences it may draw.

"(b) The prosecutor should not express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." 1 ABA Standards for Criminal Justice, Prosecution Function and Defense Function, Standard 3-5.8 (3d ed. 1993).

Both the prosecutor and the trial judge have a responsibility to ensure that closing argument is kept within the proper bounds. ABA Standard 3-5.8(e).

Pabst's credibility was crucial to the case. The prosecutor placed before the jury unsworn testimony which it should not have considered: his personal opinion on Pabst's credibility and the credibility of the State's evidence. Stating facts not in evidence is clearly improper. See *State v. Bradford*, 219 Kan. 336, Syl. ¶ 4, 548 P.2d 812 (1976). Accusing Pabst of lying goes far beyond the traditional wide latitude afforded to prosecutors in closing argument. See *Lockhart*, 24 Kan. App. 2d at 492. Inherent in this wide latitude is the freedom to craft an argument that includes reasonable inferences based on the evidence. When a case develops that turns on which of two conflicting stories is true, it may be reasonable to argue, based on evidence, that certain testimony is not believable. However, the ultimate conclusion as to any witness' veracity rests solely with the jury.

The remaining question is whether the prosecutor's improper comments denied Pabst a fair trial by unfairly prejudicing the jury against him. See *State v. Whitaker*, 255 Kan. 118, Syl. ¶ 7, 872 P.2d 278 (1994).

Previous cases have examined the prejudicial effect of the prosecutor calling a defendant a liar. In *State v. McClain*, 216 Kan. 602, 608, 533 P.2d 1277 (1975), Commissioner Harman speaking for the court said: "Counsel may comment on the credibility of a witness where his remarks are based on the facts in evidence and a considerable latitude is allowed in that discussion." *McClain* properly holds that the question of reversal is one of prejudicial effect rather than professional propriety. 216 Kan. at 608. However, *McClain's* suggestion that it is proper to comment on a witness' credibility is not in accord with KRPC 3.4(e) and is disapproved.

In *Whitaker*, 255 Kan. 118, the prosecutor told the jury that someone had lied to it and pointed at the defendant. We did not find reversible error because "the comments improperly characterized Whitaker as a liar but did not so prejudice the jury against him as to deny him a fair trial." 255 Kan. at 135.

In *State v. Eastridge*, 20 Kan. App. 2d 973, 894 P.2d 243 (1995), the Court of Appeals addressed prosecutorial misconduct. The State characterized Eastridge and his alibi witnesses as liars. The Court of Appeals held no reversible error occurred because the State's argument was that the alibi was a fabrication; in light of the entire record, the State's closing did not so prejudice the jury as to deny Eastridge a fair trial.

*Lockhart*, 24 Kan. App. 2d 488, found reversible error where the prosecutor suggested that both Lockhart and his counsel were lying to the jury. The *Lockhart* court was "not convinced that the statements made by the prosecutor would have little weight in the minds of the jury in trying to decide whether Lockhart was guilty." 24 Kan. App. 2d at 492.

Various tests have been structured for determining whether a defendant was prejudiced by improper comments that are so gross and flagrant as to prejudice the jury. See, *e.g.*, *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981), *cert. denied* 456 U.S. 989 (1982) (three-factor test for determining the existence of "substantial prejudice": [1] severity of the misconduct; [2] measures adopted to cure the misconduct; and [3] the certainty of a conviction absent the improper statements); *United States v. Leon*, 534 F.2d 667, 679, (6th Cir. 1976) (applying a four-factor test). We have said that the question is whether an appellate court can declare beyond a reasonable doubt that the prosecutorial misconduct had "little, if any, likelihood of having changed the result of the trial." *State v. Thompson*, 221 Kan. 176, 183, 558 P.2d 93 (1976). The *Thompson* factors have been cited several times by the Court of Appeals:

> " ' "When determining whether prosecutorial misconduct was prejudicial, factors that should be considered include: (1) Is the misconduct so gross and flagrant as to deny the accused a fair trial? (2) Do the remarks show ill will on the prosecutor's part? (3) Is the evidence against the defendant of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of jurors? [Citations omitted.]" ' " *Lockhart*, 24 Kan. App. 2d at 492.

Accord *State v. Marble*, 21 Kan. App. 2d 509, 515, 901 P.2d 521, *rev. denied* 258 Kan. 861 (1995); see *State v. Perrigo*, 10 Kan. App.

2d 651, 654, 708 P.2d 987 (1985). Such tests are helpful in assisting courts to focus on the overall impact of the improper remarks.

In assessing prejudice, it is important to first recognize that the jury here had to decide whether the shooting was accidental or planned. The prosecutor should have confined his arguments to what the evidence showed. Instead, the prosecutor's improper argument commented on what the jury inevitably had to decide: whether Pabst's assertion of an accidental shooting was a fabrication. The prosecutor's statements are problematic because he improperly and prejudicially attempted to introduce evidence on the ultimate issue.

We key on the interplay of the prosecutor's closing and the district court's action in overruling a critical objection. When the prosecutor continued to characterize Pabst as a liar, he ignored the district court's ruling sustaining the objection to his previous improper comment. The prosecutor told the jury, "I look into each one of your eyes and I tell you he lied." Defense counsel objected. The objection was sustained. The district court properly directed the jury to disregard the comment. The next words from the prosecutor were "The State tells you he lied. The State of Kansas —." Defense counsel objected. Before the district court could rule on the objection, the prosecutor interjected, "That's fair comment, Your Honor." Rather than again sustaining the objection and again directing the jury to disregard the remarks, the district court overruled the objection.

When the district court overruled the objection and allowed the prosecutor to continue accusing Pabst of lying, what was the jury to think? The prosecutor's improper comment, "I tell you he lied," which the jury had moments before been told to disregard was then resurrected and endorsed by the district court. A jury likely sees little difference (and there is none) between the prosecutor personally calling the defendant a liar and the "State" calling the defendant a liar. The district court's endorsement may have increased the prejudicial effect of the improper comments. See *State v. Zamora*, 247 Kan. 684, 691, 803 P.2d 568 (1990) (convictions reversed where prosecutor's misconduct was compounded by trial court overruling objection and failing to admonish jury); *State v.*

*Salter,* 2 Kan. App. 2d 635, 637-39, 586 P.2d 62 (1978) (new trial granted where prosecutor stated witness lied and judge overruled objection saying it was a "fair conclusion").

A prosecutor is a servant of the law and a representative of the people of Kansas. We are unable to locate an excuse for a prosecutor's failure to understand the remarkable responsibility he or she undertakes when rising in a courtroom to announce an appearance for the State of Kansas. Instructional materials abound on this topic. Sixty-five years ago the United States Supreme Court said that the prosecutor represents

> "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States,* 295 U.S. 78, 88, 79 L. Ed. 1314, 55 S. Ct. 629 (1935).

Twenty years ago an exhaustive review of prosecutorial misconduct in closing argument was published by the Journal of the Kansas Bar Association. See Johnson and Southard, *Prosecutorial Misconduct in Closing Argument: Does Harmless Error Mean Never Having to Say "Reversed?",* 49 J.K.B.A. 205 (1980). More recently Professor Paul J. Spiegelman has treated the question from a national perspective. See Spiegelman, *Prosecutorial Misconduct in Closing Argument: The Role of Intent in Appellate Review,* 1 J. Appellate Prac. and Process 115 (1999).

The State's characterization of the prosecutor's statement that a defendant is lying, as a comment on the evidence, misses the mark. The point of not allowing a prosecutor to comment on the credibility of a witness *is that expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony,* not *commentary on the evidence of the case.* Also, as we have observed, such argument is expressly forbidden by both the KRPC 3.4 and the ABA Standards for Prosecutors, 3-5.8 Commentary, Personal Belief. Here an assistant attorney general from the office of the attorney general criminal litigation division introduced into the case his personal opinion of Pabst's credibility. He ignored his special obligation as a prosecutor to avoid improper personal insinuations. Because he represented the State of Kansas the jury might

have been misled into thinking his personal opinions were validated by the weight of the State of Kansas. Such prosecutorial vouching places the prestige of the State behind the prosecutor's personal assurances.

One further allegation of misconduct in the prosecutor's argument advances our prejudice analysis. The prosecutor insisted that if the jury disbelieved Pabst, it had to convict him. The prosecutor said:

> "And you heard him agree that if he—this jury found that he lied, then you would find him guilty of first degree murder. He agreed with that. So you have to believe him. *If you don't believe him, then's he's guilty. And he admits it.*"

The prosecutor questioned Pabst during cross-examination on whether the jury could convict him if it did not believe him. A defense counsel's objection was sustained, and Pabst gave no answer. Thus, Pabst did not "admit it" as the prosecutor urged in his closing. The prosecutor's remark was improper. It is the State's burden to prove beyond a reasonable doubt that the defendant is guilty of the crime charged. *State v. Keeler*, 238 Kan. 356, 361-62, 710 P.2d 1279 (1985). If a jury disbelieves a testifying defendant's testimony, that is insufficient to meet the State's burden. See *In re Winship*, 397 U.S. 358, 364, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970); *State v. Rios*, 19 Kan. App. 2d 350, 359, 869 P.2d 755 (1994). The important point is, if the jury did not believe Pabst, that was *not* enough to convict him of premeditated first-degree murder. The jury had to conclude that *the State's evidence proved Pabst guilty of premeditated first-degree murder* beyond a reasonable doubt.

The jury could have found, based on the physical evidence, that Pabst was guilty. However, the jury also might have decided Pabst was guilty because the prosecutor told it Pabst was lying, and if he was lying, it could convict him. Evidence of premeditation was sufficiently convincing under our standard of review, but not overwhelming. We therefore hold that the cumulative nature of the prosecutor's errors, coupled with the action of the district court in overruling Pabst's timely objection to the accusations of lying, requires a reversal. See *State v. Cravatt*, 267 Kan. 314, 332, 979 P.2d

679 (1999); *Zamora,* 247 Kan. at 692; *Thompson,* 221 Kan. at 183; *Lockhart,* 24 Kan. App. 2d at 492.

Because we have decided that the prosecutor's misconduct denied Pabst a fair trial, we must also address Pabst's sufficiency of the evidence argument. "[A] reviewing court must consider all of the evidence admitted by the trial court in deciding whether retrial is permissible under the Double Jeopardy Clause." *Lockhart v. Nelson,* 488 U.S. 33, 41, 102 L. Ed. 2d 265, 109 S. Ct. 285 (1988); see *Burks v. United States,* 437 U.S. 1, 11, 57 L. Ed. 2d 1, 98 S. Ct. 2141 (1978).

### Sufficiency of the Evidence

When the sufficiency of the evidence is challenged, the question is whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Johnson,* 266 Kan. 322, 326, 970 P.2d 990 (1998).

Pabst takes issue with the evidence on the ground that there was no direct evidence of premeditation. Pabst contends the State built its case by stacking inference upon inference, citing *State v. Williams,* 229 Kan. 290, 623 P.2d 1334, *reh. denied* 229 Kan. 646, 630 P.2d 694 (1981). Pabst also claims the State's evidence fails to demonstrate how the shooting occurred and instead merely attempted to prove the shooting did not occur as Pabst testified.

Where reliance is placed upon circumstantial evidence, the circumstances in question must themselves be proved and cannot be inferred or presumed from other circumstances. *State v. Rice,* 261 Kan. 567, Syl. ¶ 6, 932 P.2d 981 (1997). We inquire whether "the circumstances alleged to justify a finding of premeditation are adequately proven by evidence, and are not merely suppositions themselves." *Rice,* 261 Kan. at 587.

"Premeditation means to have planned, contrived, schemed, and thought over the matter beforehand, although no particular amount of time must intervene between the time the killing is planned and the time it is consummated." *State v. White,* 263 Kan. 283, 294, 950 P.2d 1316 (1997). Premeditation may be inferred

from various circumstances, including: (1) the nature of the weapon used; (2) the lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; or (5) the dealing of lethal blows after the deceased was felled and rendered helpless. *White,* 263 Kan. at 294 (citing *State v. Henson,* 221 Kan. 635, 639, 562 P.2d 51 [1997]). The foregoing circumstances must be proved by direct evidence rather than being suppositions themselves. *Rice,* 261 Kan. at 587. Applying these factors to the case at bar, premeditation may be inferred from many of them.

The weapon used was a deadly one. We find no suggestion of provocation beyond a mild, nonviolent argument. The only other person at home at the time of the shooting was the 3-year-old daughter. Pabst admitted saying after the shooting, "I made sure [my daughter] was in the garage before the gun went off." Two lethal shots were involved here. The first shot killed Harkins immediately, yet a second shot was fired. Pabst admitted the shot that hit Harkins in the side of the head was the second shot fired. He could not explain why the gun fired a second time. He also admitted that his hands may have been the only ones on the gun during the second shot. There was contested evidence that the gun was found in a "cocked" position with another live round under the hammer ready to be fired for a third time.

The record also contains pictures of Harkins's body as it was found. The photographs strongly suggest that she was shot as she sat on the couch. Her legs are crossed above the knee. There are no visible indications of a struggle. Pabst admits firing the gun. The only question was whether the shooting was accidental or planned. Pabst ignores the evidence that refuted his claim of a struggle and accidental shooting.

There was direct evidence that Pabst shot Harkins and that the shooting did not occur as a result of a struggle over the gun. This direct evidence was sufficient for the jury to conclude that Pabst killed Harkins with premeditation.

We may infer premeditation and deliberation from these established circumstances of the case because the inference is reasonable and the circumstances are supported by direct evidence. See

*Rice,* 261 Kan. 567, Syl. ¶ 6. Reviewing all of the evidence, viewed in the light most favorable to the State, we conclude beyond a reasonable doubt that there was sufficient evidence to support a conviction in this case.

## Remaining Issues

We address Pabst's remaining issues as they may again appear before the district court. Pabst contends error in excluding a photograph of the weapon and excluding the testimony of his ex-wife. We review a district court's decision on the admissibility of evidence for abuse of discretion. *State v. Dias,* 263 Kan. 331, 337, 949 P.2d 1093 (1997); *White,* 263 Kan. at 299.

The photograph at issue is a re-creation of how Pabst claims the gun was found after the shooting. The testimony about whether there was a live round under the hammer of the gun was disputed. According to Pabst, there could not have been a live round under the hammer because he did not cock the weapon after it fired a second time (which would have moved a live round under the hammer).

Pabst claims he sought to introduce the photograph to support his theory of an accidental shooting and to rebut the State's theory of premeditation. (The State argued that the presence of a live round under the hammer showed that Pabst cocked the gun and considered firing a third shot at Harkins.) The transcript, however, reflects that the defense offered the photograph "for the limited purpose of demonstrating to the jury that this evidence could have been preserved. All they had to do was take a picture." The district court admitted one of the three photographs offered by the defense for that limited purpose. We find no abuse of discretion in limiting the photographic evidence on this point to one picture.

Pabst next asserts error in excluding the testimony of his ex-wife, Barbara Dauge. Dauge's expected testimony involved an earlier incident with Pabst and the same gun that killed Harkins. Pabst began an affair with Harkins while married to Dauge. When Dauge returned home one day, Pabst was seated on a couch with the gun sitting on a table in front of him. Pabst confessed the affair with Harkins and told Dauge she should shoot him because he was so

worthless. The district court excluded this testimony under K.S.A. 60-447 and *State v. Gaines,* 260 Kan. 752, 765, 926 P.2d 641 (1996), as evidence of a bad character trait.

K.S.A. 60-447 provides:

> "Subject to K.S.A. 60-448 when a trait of a person's character is relevant as tending to prove conduct on a specified occasion, such trait may be proved in the same manner as provided by K.S.A. 60-446, except that (a) evidence of specific instances of conduct other than evidence of conviction of a crime which tends to prove the trait to be bad shall be inadmissible, and (b) *in a criminal action evidence of a trait of an accused's character as tending to prove guilt or innocence of the offense charged, (i) may not be excluded by the judge under K.S.A. 60-455 if offered by the accused to prove innocence,* and (ii) if offered by the prosecution to prove guilt, may be admitted only after the accused has introduced evidence of his or her good character." (Emphasis added.)

Pabst argues that specific instances of conduct offered by a criminal defendant at trial are admissible under K.S.A. 60-446 and K.S.A. 60-447 to prove innocence. His argument is that the evidence showed a lack of premeditation and intent to kill because it supported Pabst's "otherwise difficult to understand rationale of . . . bringing a gun to Ms. Harkins and asking her to shoot him if she thought he was so worthless."

The State contends that the proffered evidence was that of a bad character trait. The evidence would be used to show Pabst acted in a particular way on a specific occasion. The parties assume, without analysis, that the disputed testimony is character evidence. That assumption is questionable. See *Gaines,* 260 Kan. at 765.

*Gaines* involved a sexual assault. The victim reported that the perpetrator twice grabbed her foot and sucked on her big toe. The State sought to introduce testimony by Gaines' ex-wife that he sucked on her big toe while they were engaged in sexual conduct. The State argued it "was relevant to prove a habit of the defendant which identified him as the attacker." 260 Kan. at 764. Gaines contended the evidence should be excluded under K.S.A. 60-447 as a bad character trait. We held the proffered evidence did not qualify as habit evidence and did not involve a character trait, but was relevant and admissible. 260 Kan. at 768.

The type of character traits contemplated by K.S.A. 60-447 are "traits such as violent, gentle, trusting, or angry. Toe sucking is not necessarily good or bad, but is simply a fact." *Gaines,* 260 Kan. at 765. Pabst's alleged handing of guns to his domestic partners and asking them to shoot him if they thought he was worthless is not necessarily good or bad. No character trait is shown by the testimony at issue here. It is "simply a fact."

Pabst offered the contested evidence to corroborate his story and explain his actions on the night in question. We cannot predict what path the testimony will take at a second trial. However, this specific instance of conduct is not governed by K.S.A. 60-447 or K.S.A. 60-446 and is admissible if relevant. See *Gaines,* 260 Kan. at 767; *State v. Sexton,* 256 Kan. 344, 349, 886 P.2d 811 (1994) (involving evidence of specific instances of sexual bondage).

Pabst's final issue, that the State failed to give timely notice of its intent to seek a hard 40 sentence, is without merit.

Reversed and remanded for a new trial.